UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


BRITTANY M. JURJ, an Idaho resident,

        Plaintiff,

           v.

M. ROBERT ALBERS, as guardian ad litem for
SANDRA G. ANDERSEN, an Oregon resident,

        Defendant.

Case No. 3:21-cv-00088-YY

OPINION AND ORDER


YOU, Magistrate Judge.

      Plaintiff Brittney Jurj alleges that defendant Sandra Andersen,[1] who was plaintiff's step-grandmother before plaintiff's paternal grandfather passed away and defendant subsequently remarried, agreed to buy plaintiff's shares in a closely held family business for $10 million. The purported agreement was part of a deal between the two in connection with a different lawsuit related to the family business that they had jointly brought against other family members. Plaintiff filed this present suit asserting breach of contract and promissory estoppel claims after

---

[1] On March 22, 2024, the court appointed defendant's husband, M. Robert Albers, as guardian ad litem for defendant, and pursuant to Rule 25, ordered that this matter "shall proceed by and against defendant 'M. Robert Albers, as guardian ad litem for Sandra Andersen.' " Opinion and Order (Mar. 22, 2024), ECF 156. The present order refers to Andersen as the "defendant," and to Albers in his individual capacity unless specifically noted otherwise.

defendant refused to pay. Defendant denies that she signed the contract and or that she otherwise agreed to buy the shares, and asserts that, in any event, the purported contract is unenforceable because, among other things, it does not comply with a transfer restriction on the company's shares and because, in the time since the alleged agreement, the company was liquidated, resulting in approximately $7 million in dividends being paid to plaintiff thus rendering plaintiff's shares in the company essentially worthless. Defendant also asserts counterclaims against plaintiff for *quantum meruit*—seeking reimbursement for plaintiff's share of the legal bills that defendant paid for their joint suit—and elder financial abuse based on an allegation that plaintiff forged or otherwise wrongly secured defendant's signature on their purported agreement.

Currently pending are numerous dispositive motions from both parties: plaintiff's Motion for Judgment on the Pleadings Against the Counterclaims (ECF 88); plaintiff's Motion for Summary Judgment Against Defendant's Counterclaims (ECF 95); plaintiff's Motion for Summary Judgment Against Defendant's Affirmative Defenses (ECF 102); plaintiff's Motion for Summary Judgment on Plaintiff's First Claim for Relief (ECF 157), which asserts both a breach of contract and a promissory estoppel theory, *see* First Am. Compl. ¶¶ 23–31, ECF 28; and defendant's Motion for Summary Judgment (ECF 117). The court held oral argument in June of 2024, and subsequently ordered the parties to file supplemental materials, which they filed in late June and July of 2024. *See* Order (June 11, 2024), ECF 162; *see also* ECF 164, 165, 166, 167, 168, 171, 17, 173, 174.

As explained more fully below, defendant's motion for summary judgment is granted because even assuming that defendant actually signed the purported "Stock Purchase Agreement"—a question that the parties vigorously dispute—plaintiff did not satisfy a condition

precedent to her performance under it or her right to enforce it against defendant. Specifically, plaintiff's shares in Rosan, Inc. ("Rosan") were subject to the Rosan Shareholder Agreement, which required plaintiff to notify the other Rosan shareholders of the proposed sale of her shares to defendant and give the other shareholders the right of first refusal. Plaintiff admits that she did not satisfy this condition of the Rosan Shareholder Agreement before attempting to enforce the Stock Purchase Agreement against defendant. The Rosan Shareholder Agreement provides that any proposed sale that does not strictly comply with the transfer restrictions provisions is void, and thus plaintiff could not deliver on her part of the agreement and cannot recover against defendant for any alleged breach.

And no matter whose version of events regarding the disputed Stock Purchase Agreement is believed, the existence of a written agreement requires summary judgment in defendant's favor on plaintiff's promissory estoppel claim because either the parties' agreement was actually reduced to writing in the Stock Purchase Agreement, thus foreclosing recovery on a promissory estoppel theory, or defendant did not knowingly sign the Stock Purchase Agreement and justice would not be served by forcing defendant to pay plaintiff for any promise under such circumstances. These infirmities in plaintiff's two remaining claims for relief necessarily renders moot plaintiff's motion for partial summary judgment on defendant's affirmative defenses and her motion for summary judgment on her first claim for relief.

Plaintiff's motion for judgment on the pleadings and motion for summary judgment on defendant's counterclaims is denied as to defendant's counterclaim for *quantum meruit* or unjust enrichment because there is a disputed issue of fact as to whether plaintiff and defendant had an agreement about who was responsible for paying their joint attorney fees. However, plaintiff's motion for summary judgment is granted as to defendant's counterclaim for elder financial abuse

because defendant has not established any "taking," as that statutory term is understood under Oregon law; this renders moot plaintiff's motion for judgment on the pleadings against the elder abuse counterclaim.

The analysis below frames the issues in a manner that reflects the practical implications each issue has on the case as a whole. Note, however, that the court has considered the arguments raised by the parties across the various motions and cross-motions, notwithstanding the eventual conclusion that it is not necessary to rule on certain motions to resolve the parties' disputes at this stage.

## I.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324 (citing Fed. R. Civ. P. 56(e)).

The court "does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999). "Reasonable doubts as to the existence of material factual issue are resolved against the moving parties and inferences are drawn in the light most favorable to the non-moving party." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## II.    Background

The purported Stock Purchase Agreement at the heart of this dispute states that defendant agreed to purchase plaintiff's 5,325 shares of common stock in Rosan for $1,877.93 per share, or just shy of $10 million.[2] The Agreement is dated December 12, 2019, and displays the signatures of both plaintiff and defendant.[3] That much is undisputed. The parties fiercely debate, however, the circumstances leading up to this purported agreement, what happened next, and who is liable.

Rosan is a closely held real estate development and property management business founded in 1996 by Warren Rosenfeld and Andy Andersen ("Andy"), plaintiff's paternal grandfather.[4] Rosenfeld, Andy, defendant, and plaintiff's father, David Andersen ("David"), were among the original Rosan shareholders.[5] When Andy died in 2008, his shares passed to defendant, giving her the largest share of any shareholder.[6] David gifted 5,325 shares to each of his children, including plaintiff, in 2012.[7] Starting in 2016, plaintiff discovered some "questionable" transactions involving her father, brother, and uncle that led plaintiff to believe they had diverted opportunities and asserts away from Rosan to other companies they held or controlled that competed with Rosan.[8] Plaintiff brought these concerns to defendant, and in November of 2018, plaintiff and defendant hired lawyers at Perkins Coie to jointly represent them in bringing an action against the other family members.[9]

---

[2] *See* Stanford Decl., Ex. 3 ("Stock Purchase Agreement" or "SPA") at 1, ECF 118-3.
[3] *Id.* at 1, 4.
[4] First Am. Compl. ¶¶ 5–6, ECF 28; *see also* Stanford Decl., Ex. 5 at 1, ECF 118-5; *id.*, Ex. 21 at 1–2, ECF 118-22.
[5] Stanford Decl., Ex 4 ("Rosan Shareholder Agreement" or "RSA") at 1, ECF 118-4.
[6] *See id.*, Ex. 21 at 1–2, ECF 118-22.
[7] *Id.* at 1.
[8] First Am. Compl. ¶¶ 9– 10, ECF 28.
[9] *See* Heekin Decl., Dep. Ex. 11 at 1, ECF 98-11 (engagement letter).

In June of 2019, plaintiff and defendant filed suit in Oregon state court as co-plaintiffs against the other family members (hereinafter the "2019 State Shareholder Case").[10] A mediation in September of 2019 failed to resolve the matter.[11] Plaintiff felt frustrated by the slow pace of the case, the mediation process, and the course of the representation that Perkins had taken so far, which plaintiff believed reflected that Perkins "did not seem to understand the full range of claims" based on the information she had brought to them, and was "focused primarily on [defendant's] claims . . . even though Perkins Coie jointly represented us."[12] The parties engaged a second mediator "to focus particularly on [plaintiff's] claims and issues."[13] As part of the conversations with this second mediator, Perkins asked plaintiff to clarify her "monetary and nonmonetary goals" in trying to settle her claims.[14] Two of plaintiff's primary goals were to get a "Rosan valuation at $185M" and for her to be bought out of the company for approximately $10 million.[15]

At some point shortly thereafter, Perkins identified a conflict of interest based on, among other things, plaintiff's and defendant's settlement goals—in particular plaintiff's goal to be bought out of the company and one of defendant's "current[t]" settlement goals to "retain her interest in Rosan, but without" David (plaintiff's father) and Stephen Andersen ("Stephen") (plaintiff's uncle) "involved in the management of the company."[16] Perkins advised plaintiff to

---

[10] *Sandra Andersen and Brittany Jurj, Individually and Derivatively on behalf of Nominal defendants Shoestring Valley Holdings, Inc., f/k/a Andersen Construction Company, Inc., and Rosan, Inc.*, Multnomah County Circuit Court Case No. 19CV25063; *see also* Heekin Decl., Dep. Ex. 48 at 1, ECF 98-18 (2019 State Shareholder Case complaint).
[11] *See* O. Jurj Decl. ¶ 7, ECF 96.
[12] *See id.* ¶ 3; B. Jurj Decl. ¶ 5–6, ECF 97.
[13] B. Jurj Decl., Ex. 1 at 2, ECF 97-1; *see also* Heekin Decl. (O. Jurj. Dep. 144:7–145:18), ECF 98-3; Heekin Decl. (S. English Dep. 69:25–70:20), ECF 98-6.
[14] Heekin Decl., Dep. Ex. 14 at 2, ECF 98-12.
[15] *Id.* at 1.
[16] Heekin Decl., Dep. Ex. 15 at 1, ECF 98-13 (Nov .11, 2019, letter outlining conflict).

consult independent legal counsel to discuss the various conflicts and "what the best course of action for you should be in the settlement and related lawsuit."[17]

Plaintiff was suspicious of what she saw as a sudden change in litigation strategy and she resisted the lawyers' attempt to end the joint representation for the lawsuit.[18] One of plaintiff's key factual theories underlying her current claims is that she and defendant had a shared goal at the beginning of the litigation to be bought out of Rosan by the other family members.[19] She believes that the lawyers from Perkins had discussions with defendant and this second mediator without including her, and it was these discussions that at least in part caused the apparent shift in defendant's settlement goals.[20] Plaintiff again had the impression that Perkins was more vigorously and satisfactorily representing defendant's interests over hers and "trying to pit [defendant] against me."[21]

In any event, the conflict between defendant and plaintiff and how to resolve it was the topic of numerous phone calls and written communications between some combination of plaintiff and her husband, Octavian Jurj ("Octavian"), and defendant and her husband, Robert Albers, and Perkins, in November of 2019.[22] Octavian secretly recorded some of the calls and there are call transcripts in the record.[23] Eventually, there was some kind of agreement reached

---

[17] *Id.* at 2.

[18] *See* Heekin Decl. (B. Jurj Dep. 47:24–48:12), ECF 98-2; *id.*, Dep. Ex. 9 at 1–2, ECF 98-10.

[19] B. Jurj Dep. 47:24–48:12, ECF 98-2.

[20] *See, e.g.*, Pl. Mot. Summ. J. 7–8, ECF 157. Previously, the court denied plaintiff's motion to compel production of confidential materials from the second mediator. Opinion and Order (Sept. 16, 2022), ECF 49.

[21] *See* Pl. Mot. Summ. J. 11–12; B. Jurj Decl. ¶¶ 5–15, ECF 97.

[22] *See* Heekin Decl., Dep. Ex. 91 (Nov. 20, 2019 Phone Call between Octavian and Perkins), ECF 98-22 (recorded phone call); Stanford Decl., Ex. 15 at 1–3, ECF 118-16;

[23] *See* Stanford Decl., Ex. 6 (O. Jurj Dep. 30:15–31:11), ECF 118-6; *see also* Nov. 20, 2019 Phone Call, ECF 98-22; Stanford Decl., Ex. 12a (Nov. 13, 2019 Phone Call 1 between plaintiff, Octavian, defendant, and Albers), ECF 118-12; *id.*, Ex. 12b (Nov. 13, 2019 Phone Call 2 between plaintiff, Octavian, and Albers), ECF 118-13.

that seemed to cure the conflict, although the parties do not agree on what the terms of that agreement were.

Defendant insists that the conflict was resolved on terms memorialized in a joint representation letter from Perkins on November 19, 2019, stating that plaintiff had "agreed not to sell [her] ownership interest in Rosan to anyone other than" defendant or her husband.[24] According to defendant, she did not agree to actually purchase plaintiff's shares at all, much less for a specific price. *See* Def. Mot. Summ. J. 9, ECF 117 ("Nowhere . . . is there any reference to $10 million or any sort of purchase price for [plaintiff's] Rosan shares. The deal . . . was that *if* plaintiff sold her shares the sale would be to [defendant].") (emphasis in original) (some capitalization omitted).

Plaintiff insists that the Stock Purchase Agreement is the agreement that resolved the conflict and reflected the parties' true contractual intent, whereby defendant agreed to buy plaintiff's shares for approximately $10 million. Pl. Mot. Summ. J. 17–20, ECF 157. Octavian asserts that he drafted the Stock Purchase Agreement at Albers' direction sometime between November and December of 2019 based on a verbal agreement reached during the discussions he and plaintiff had with defendant and Albers.[25] Octavian states that plaintiff signed the Stock Purchase Agreement in their home in Idaho on December 10, 2019, and he then flew to Portland that same day, "stopped by" defendant's house, and handed the "document in a manila folder" to defendant at the door to her home.[26] Plaintiff asserts that, thereafter, on December 12, 2019, she and Octavian visited defendant and Albers at their house in Portland, and as she and Octavian

---

[24] Stanford Decl., Ex. 14 at 1, ECF 118-15.
[25] Stanford Decl., Ex. 6 (O. Jurj Dep. 6:19–7:19), ECF 118-6; *see also* O. Jurj Decl ¶ 1, ECF 128.
[26] B. Jurj Decl. ¶ 13, ECF 97; O. Jurj Dep. 8:10–18, ECF 118-6.

were leaving, they "were given a copy of the Stock Purchase Agreement" that contained both plaintiff's and defendant's signatures.[27] Plaintiff did not see defendant sign the document.[28]

Setting aside the dispute over which terms represent the parties' true agreement, whatever was communicated to Perkins was sufficient in the firm's mind to clear the conflict and continue the joint representation in the 2019 State Shareholder Case.[29] Approximately eight months later, in July of 2020, plaintiff discontinued Perkins' representation and hired her own attorney.[30] A week after that, the second mediator communicated a settlement proposal to plaintiff; she felt pressured by the timing and that her new attorney had not had a sufficient opportunity to learn about the dispute and its history to "evaluate [the] mediator's proposal intelligently."[31] Defendant settled her claims but plaintiff did not.[32] Defendant's claims in the 2019 State Shareholder Case were dismissed with prejudice via stipulation in December of 2020.[33]

In January of 2021, after plaintiff learned that defendant had settled, she demanded payment from defendant pursuant to the Stock Purchase Agreement in the form of an approximately $5 million down payment and four subsequent installments.[34] When defendant refused to pay by the January 8, 2021 deadline, plaintiff filed this suit.[35] Plaintiff also continued to pursue her claims in the 2019 State Shareholder Case. According to plaintiff, because of the information she had about the other family members and their various business dealings, the decision was made to liquidate Rosan's assets (primarily real estate holdings) and through that

---

[27] B. Jurj Decl. ¶ 13, ECF 97.
[28] *Id.*
[29] Stanford Decl., Ex. 14 at 1, ECF 118-15.
[30] B. Jurj Decl., ¶ 16, ECF 97.
[31] *Id.*
[32] *Id.*; *see also* Heekin Decl. ¶ 8, ECF 98.
[33] Heekin Decl., Ex. 1 at 1–2, ECF 98-8; *see also* Heekin Decl. ¶ 10, ECF 98.
[34] Heekin Decl., Dep. Ex. 26 at 1–2, ECF 98-16.
[35] *See* Compl., ECF 1 (filed Jan. 21, 2021).

liquidation, plaintiff received approximately $7 million in distributions.[36] Plaintiff settled her claims in the 2019 State Shareholder Case in September of 2022.[37]

Finally, circling back to the Stock Purchase Agreement, plaintiff's suit here seeks to enforce defendant's purported promise to purchase plaintiff's Rosan shares for $10 million. Defendant denies signing the Stock Purchase Agreement, and many of the issues raised in the parties' numerous pending motions revolve around the circumstances immediately surrounding the alleged formation of this agreement. An electronic copy of the agreement has a signature on it that "looks like" defendant's, but defendant denies signing it.[38] Octavian prepared the agreement from "something [he] found online," although he does not recall where he found the template, and he did not send an electronic version of the agreement to defendant, Albers, or anyone else or save it to any cloud service.[39] Octavian attests that the first time he presented the document to either defendant or Albers was when he brought a physical copy of the document to defendant's home, but no one saw defendant sign it,[40] and a wet-ink original of the document cannot be found.[41] The computer that Octavian used to draft the document is gone, and no previous versions of the electronic document can be found.[42] Albers and lawyers at Perkins— persons who were at least substantially involved in, if not primarily directing, defendant's litigation of the 2019 State Shareholder Case—deny ever seeing the Stock Purchase Agreement

---

[36] B. Jurj Decl. ¶ 19, ECF 97. Defendant asserts that plaintiff also received an additional nearly $1 million in the form of a loan from her father, David, based on the anticipated value of the final distribution plaintiff would receive after Rosan was done selling off its assets. *See* Def. Mot. Summ. J. 12, ECF 117.

[37] Heekin Decl., Dep. Ex. 97, ECF 125-2.

[38] *See* Heekin Decl. (Herron Dep. 57:8–18), ECF 98-5; *id.*, (Albers Dep. 108:7–9), ECF 98-1; Am. Ans. ¶¶ 17–20, ECF 81.

[39] O. Jurj Dep. 7:14-19, 8:2–9, 56:5–20, ECF 118-6.

[40] B. Jurj Decl. ¶ 13, ECF 97; B. Jurj Dep. 32:25–33:1, ECF 98-2.

[41] O. Jurj Dep. 33:14–18, ECF 118-6; *id.*, Ex. 16 (English Dep. 143:3–11), ECF 118-17.

[42] O. Jurj Dep. 8:2–9, 56:5–20, ECF 118-6.

prior to this lawsuit.[43] Neither the phone conversations that Octavian surreptitiously recorded, nor the written correspondence from Perkins memorializing the firm's understanding of the agreement that resolved the conflict of interest, directly support the key terms that plaintiff seeks to enforce in the Stock Purchase Agreement, such as a specific $10 million purchase price or that defendant was committed to actually purchasing plaintiff's shares.[44] Still, it cannot be denied that a copy of the document exists and it appears to bear defendant's signature.[45]

Plaintiff's motions for summary judgment on her first claim for relief and for summary judgment on defendant's affirmative defenses require, at least to some extent, an evaluation of the evidence the parties have produced about the circumstances surrounding the Stock Purchase Agreement. Defendant's motion for summary judgment asks the court to side-step a ruling on the validity of the Stock Purchase Agreement and frames her argument in a way that assumes (without, of course, conceding) that the terms of the Stock Purchase Agreement should control the outcome here. Def. Mot. Summ. J. 2, ECF 117. Because, as explained below, the analysis of the Stock Purchase Agreement is dispositive of plaintiff's claims for breach of contract and promissory estoppel, the court makes no ruling regarding the formation of the Stock Purchase Agreement and instead assumes that agreement is the controlling document for evaluating defendant's motion for summary judgment on plaintiff's breach of contract claim.[46]

---

[43] Albers Dep. 108:7–23, ECF 98-1; English Dep. 143:3–11, ECF 118-17.
[44] *See* Stanford Decl., Ex. 14 at 1, ECF 118-15; Nov. 20, 2019 Phone Call, ECF 98-22; Nov. 13, 2019 Phone Call 2, ECF 96-2.
[45] SPA at 4, ECF 118-3.
[46] There are other issues raised throughout the various motions, however, where the existence of the Stock Purchase Agreement does not necessarily control. The analysis there, as will be noted where appropriate, will not necessarily assume that defendant signed the Stock Purchase Agreement. Nothing herein should be taken as a ruling on the issue of whether defendant knowingly signed the Stock Purchase Agreement.

### III.    Discussion

#### A.    Breach of Contract

Defendant asserts that even assuming (without conceding) that the Stock Purchase Agreement is a valid contract, plaintiff's breach of contract claim necessarily fails because the Stock Purchase Agreement is void or otherwise unenforceable for three reasons: (1) conditions precedent to the transfer imposed by the Stock Purchase Agreement itself and by a separate Rosan Shareholder Agreement were not satisfied and thus the sale cannot be completed; (2) the Stock Purchase Agreement is too vague and illusory to be enforceable; and (3) the purpose of the Stock Purchase Agreement has been frustrated or defendant's performance has been rendered impractical by Rosan's liquidation and resulting approximately $7 million in distributions to plaintiff. Def. Mot. Summ. J. 2–3, ECF 117.

The first issue regarding the transfer restrictions in the Rosan Shareholder Agreement is dispositive of plaintiff's breach of contract claim, and thus the analysis begins, and ends, there. In 1996, the shareholders of Rosan[47] entered into an agreement for "restricting the transfer" of the company's shares.[48] The shareholders included Andy (plaintiff's grandfather), defendant, David (plaintiff's father), and Stephen Andersen (plaintiff's uncle); Warren and Victor Rosenfeld; and Cathy Siegel.[49] Under the Rosan Shareholder Agreement, the certificates for all Rosan shares bore the following restriction:

---

[47] Rosan was incorporated in Oregon on May 22, 1996. Stanford Decl., Ex. 5 at 1, ECF 118-5. Although the Rosan Shareholder Agreement does not specifically provide as much, presumably it is controlled by Oregon law, and neither party offers any alternative.

[48] RSA at 1, 5, ECF 118-4.

[49] *Id.* at 1.

> TRANSFER OF THESE SHARES IS RESTRICTED BY A
> SHAREHOLDERS AGREEMENT WHICH IS ON FILE WITH
> THE CORPORATION'S SECRETARY, AND NO TRANSFER
> MAY BE MADE WITHOUT STRICT COMPLIANCE WITH
> THE TERMS OF THAT AGREEMENT.[50]

Section 2 of the Rosan Shareholder Agreement is titled "Restriction on Transfer" and it essentially creates a right of first refusal for both the individual shareholders and the company for any proposed transfer of shares.[51] It provides that before there can be any valid transfer of shares, the "holder of the shares to be transferred" must give written notice to the company and provide the number of shares, the price and other terms, and a copy of the offer by the purchaser specifying the proposed terms.[52] The company then must notify the other shareholders, who then have the option to purchase some or all of the shares from the third party potential purchaser on the same terms.[53] If no shareholders exercise the option, the corporation then has the same opportunity to purchase the shares.[54] If the corporation also passes on purchasing the shares, then the sale must be completed within 30 days or the process starts over.[55]

There is an exception for certain transfers to which this right of first refusal process does not apply:

> The right of first refusal provided for herein shall not be applicable
> to (i) intervivos transfers made to members of a Shareholder's
> immediate family (spouse, brother or sister and children or
> grandchildren) or to the spouse and children or grandchildren of
> such immediate family members, (ii) testamentary transfers
> (including transfers by way of inheritance) to the permitted persons
> under (i) above, or (iii) transfers to a trust the beneficiaries of
> which are permitted transferees under (i) above. Notwithstanding
> any permitted transfer under this subparagraph (d), the restrictions

---

[50] *Id.* at 4.
[51] *Id.* at 1–3.
[52] *Id.* at 1.
[53] *Id.* at 1–2.
[54] *Id.* at 2.
[55] *Id.*; *see also* Def. Mot. Summ. J. 16, ECF 117.

of this Section 2 shall apply to any subsequent transfer by a
permitted transferee under this subsection.[56]

Finally, the Rosan Shareholder Agreement states, "Any transfer, or purported transfer, of the shares of this Corporation shall be null and void unless the terms, conditions and provisions hereof are strictly complied with."[57]

Defendant asserts that the Stock Purchase Agreement is unenforceable because plaintiff did not comply with the transfer restriction provisions in the Rosan Shareholder Agreement. Def. Mot. Summ. J. 14, ECF 117. Plaintiff does not deny that she failed present the offer embodied in the Stock Purchase Agreement to the other Rosan shareholders before seeking to enforce the Stock Purchase Agreement against defendant. Pl. Opp'n Mot. Summ. J. 16, ECF 127. Instead, plaintiff asserts that the Rosan Shareholder Agreement "is not an obstacle to enforcing" the Stock Purchase Agreement because (1) Rosan was not party to the Stock Purchase Agreement and (2) plaintiff was not a party to the Rosan Shareholder Agreement; (3) there is no evidence that the other shareholders object to plaintiff's proposed sale and the other Rosan shareholders "agreed that plaintiff could sell or transfer her shares to defendant" when the 2019 State Shareholder Case was settled; (4) defendant lacks standing to enforce the transfer limitation in the Rosan Shareholder Agreement because the right of refusal belongs to other Rosan shareholders; and (5) the transfer restriction does not apply to plaintiff's proposed sale to defendant under an exception to the transfer restriction provided for in section 2(d) of the Rosan Shareholder Agreement regarding transfers to "members of a Shareholder's immediate family[.]" *Id.* Each of these arguments is addressed in turn.

---

[56] RSA at 2 (Section 2(d)), ECF 188-4.
[57] *Id.* at 3.

Plaintiff's arguments that she is not bound by the Rosan Shareholder Agreement because she is not a party to it, or that the transfer restriction does not apply here because Rosan is not a party to the Stock Purchase Agreement, are without merit. Section 2(d) of the Rosan Shareholder Agreement expressly states that "the restrictions of this Section 2 shall apply to any subsequent transfer by a permitted transferee."[58] Plaintiff was a "permitted transferee" under Section 2(d)(i) when she received the shares from her father in 2012; thus any "subsequent transfer" by plaintiff of her shares is limited by the terms of Section 2(d). Not only that, but Section 2(a) of the Rosan Shareholder Agreement specifically states that the "holder of the shares to be transferred" must provide the required notice to the other Rosan shareholders to trigger their rights of first refusal.[59] The share's certificates themselves conspicuously state that any transfer of the shares is "restricted by a shareholder's agreement" and must "strict[ly] compl[y] with the terms of that agreement."[60] Additionally, in demanding payment from defendant under the purported Stock Purchase Agreement, plaintiff requested, by letter, that defendant "spearhead the process of transferring [plaintiff's] stock certificate . . .  in the manner that comports with the Stock Purchase Agreement and Rosan's Articles of Incorporation and By-laws."[61] While this letter does not specifically reference the transfer restriction in the Rosan Shareholder Agreement, it shows that plaintiff plainly anticipated that the sale of her shares might be subject to certain intra-company controls or procedures that had to be satisfied before the transaction could close.

Neither of plaintiff's arguments regarding the other shareholders—either that there is no evidence they currently object to her proposed sale, or that the terms of the settlement agreement

---

[58] RSA at 2, ECF 118-4.
[59] *Id.* at 1.
[60] *Id*. at 4.
[61] Stanford Decl., Ex. 18 at 2, ECF 118-19.

in the 2019 State Shareholder Case against certain Rosan shareholders do not prohibit her proposed sale—is an adequate basis for avoiding the clear dictates of the transfer restriction. *See* Pl. Opp'n Mot. Summ. J. 16, ECF 127. First, as mentioned above, the Rosan Shareholder Agreement is unequivocal that the burden to provide notice to the shareholders of any offer to purchase otherwise restricted shares is on the "holder of the shares to be transferred"—here, plaintiff—and there is no dispute that plaintiff did not provide any notice to the other shareholders of the purported sale envisioned by the Stock Purchase Agreement.[62] Whether there is evidence that any Rosan shareholder currently objects to the Stock Purchase Agreement is not controlling. The restrictive legend on the Rosan shares' certificates states that "no transfer may be made without strict compliance with the terms" of the Rosan Shareholder Agreement and, again, there is no dispute that plaintiff did not satisfy the notice requirement to trigger the other shareholders' right of first refusal under that agreement.[63]

Alternatively, plaintiff asserts that the settlement agreement she entered into regarding the 2019 State Shareholder Case "specifically does not limit or restrict 'in any way' plaintiff's rights to pursue claims related to her sale of the shares to [defendant], as alleged in this lawsuit," or her right to transfer her shares. Pl. Opp'n Mot. Summ. J. 9–10, ECF 127. But the Rosan Shareholders Agreement provides that it can only be modified by a "written document signed by all of the Shareholders," and the 2019 State Shareholder Case settlement is not signed by all of the Rosan Shareholders.[64] Furthermore, plaintiff demanded payment from defendant under the Stock Purchase Agreement in January of 2021, but the settlement for plaintiff's claims in the

---

[62] RSA at 1, ECF 118-4.
[63] *Id.* at 4
[64] *See id.* at 4; Heekin Decl., Dep. Ex. 97 at 1, ECF 125-2.

2019 State Shareholder Case did not occur until sometime around September of 2022.[65] Otherwise stated, the settlement agreement came after the Stock Purchase Agreement, defendant's alleged breach of it, and plaintiff's attempts to enforce it in January of 2021. The 2022 settlement agreement does not retroactively excuse plaintiff's failure in late 2020 or January or 2021 to ensure that her purported sale to defendant strictly complied with the Rosan Shareholder Agreement.

Plaintiff's argument that defendant lacks standing to enforce the Rosan Shareholder Agreement is similarly unavailing. *See* Pl. Opp'n Mot. Summ. J. 16, ECF 127. The issue is not whether an individual shareholder can enforce the specific right of first refusal here; rather, the problem for plaintiff is that Section 2(f) voids any transfer or purported transfer of Rosan shares that does not "strictly compl[y]" with the terms and conditions of the Rosan Shareholders Agreement.[66] Because plaintiff did not follow the right of first refusal procedures in the Rosan Shareholder Agreement, she does not have the authority to complete a valid transfer of her shares to defendant.

Nor has plaintiff shown that her purported sale to defendant was exempt from the transfer restriction as a transfer to a member of plaintiff's "immediate family" under section 2(d) of the Rosan Shareholder Agreement. That section provides, in relevant part, that the right of first refusal does not apply to "intervivos transfers made to members of a Shareholder's immediate family (spouse, brother or sister and children or grandchildren) or to the spouse and children or grandchildren of such immediate family members[.]"[67] Whether plaintiff's proposed transfer to

---

[65] Stanford Decl., Ex. 18, ECF 118-19 (demand letter); *see also* Heekin Decl., Dep. Ex. 97 at 1, ECF 125-2 (2019 State Shareholder Case settlement agreement).
[66] RSA at 3, ECF 118-4.
[67] RSA at 2, ECF 118-4.

defendant meets this exception is a question of contract interpretation, which is analyzed here under Oregon law.[68] Oregon courts follow a three-step inquiry for interpreting a contract. *Yogman v. Parrott*, 325 Or. 358, 361 (1997); *see also Ness & Campbell Crane, Inc. v. Kleppe*, No. 3:17-cv-01865-HZ, 2018 WL 1702049, at *3 (D. Or. Apr. 5, 2018). First, the court must determine whether the disputed provision is ambiguous, which is a question of law. *Ross Dress for Less, Inc. v. Makarios-Oregon, LLC*, 210 F. Supp. 3d 1259, 1263 (D. Or. 2016). A provision is ambiguous "if two or more plausible interpretations of that term withstand scrutiny, *i.e.*, continues to be reasonable, after the interpretations are examined in the light of, among other things, the particular context in which that term is used in the [contract] and the broader context of the [contract] as a whole." *Hoffman Const. Co. of Alaska v. Fred S. James & Co. of Oregon*,

---

[68] Neither party objects to the application of Oregon law of contract interpretation in analyzing the various issues related to the Stock Purchase Agreement. *See* Pl. Mot. Summ. J. 17–21, ECF 157 (asserting that defendant breached the Stock Purchase Agreement under Oregon law); Def. Mot. Summ. J. 13, ECF 117 (citing Oregon law to support argument that Stock Purchase Agreement is not enforceable). It should be noted, however, that the purported Stock Purchase Agreement states that it is controlled by Idaho law. SPA at 4, ECF 118-3. Thus, there is perhaps some question as to whether Idaho or Oregon law should apply in determining whether plaintiff satisfied the conditions of the Rosan Shareholder Agreement's transfer restriction. *See* Def. Mot. Summ. J. 14, ECF 117 (questioning whether Idaho or Oregon law should apply to the analysis of plaintiff's contract claims). Any debate is academic because there is no actual conflict between Idaho and Oregon law on the basic framework for contract interpretation. *Portfolio Recovery Assocs., LLC v. Sanders*, 292 Or. App. 463, 467–68 (2018), *aff'd*, 366 Or. 355 (2020) ("The threshold question in a choice-of-law problem is whether the laws of the different states actually conflict.") (quoting *Spirit Partners, LP v. Stoel Rives LLP*, 212 Or. App. 295, 301 (2007)); *see also Peregrine Falcon LLC, Tr. of Peregrine Falcon Leasing Tr. v. Piaggio Am., Inc.*, 446 F. Supp. 3d 654, 667 (D. Idaho 2020) ("When the language of a contract is clear and unambiguous, its interpretation and legal effect are questions of law. An unambiguous contract will be given its plain meaning. The purpose of interpreting a contract is to determine the intent of the contracting parties at the time the contract was entered. In determining the intent of the parties, this Court must view the contract as a whole. If a contract is found ambiguous, its interpretation is a question of fact. Whether a contract is ambiguous is a question of law. A contract is ambiguous if it is reasonably subject to conflicting interpretations.") (citing *Commercial Ventures, Inc. v. Rex M. & Lynn Lea Family Tr.*, 145 Idaho 208 (2008)).

313 Or. 464, 470 (1992); *see also Ness & Campbell Crane*, 2018 WL 1702049 at *3 (citing *Hoffman Const.*, 313 Or. at 470). The court must, if possible, construe the contract in a way that gives effect to all of its provisions, and is "not to insert what has been omitted, or to omit what has been inserted." *Ross Dress for Less*, 210 F. Supp. 3d at 1263 (quoting O.R.S. 42.230). If the provision is clear and unambiguous, the court applies the contractual term to the facts. *Id.*

Plaintiff's purported sale of shares to defendant does not meet this exception because the transfer is not to a member of plaintiff's "immediate family" as that term is used in the Rosan Shareholder Agreement. Although the term "immediate family" is not separately or expressly defined, the parenthetical that follows ("spouse, brother or sister and children or grandchildren") is a closed list that does not suggest other familial relationships are included.[69] Had the Rosan shareholders wanted a broadly inclusive exception to allow transfers to someone other than a spouse, brother, sister, child, or grandchild, they could have used some version of the ubiquitous phrase "including but not limited to" or something else signaling as much. Additionally, the selection of these particular family members suggests that the Rosan shareholders envisioned the transfers that would be covered by the exception were those people in the shareholders' current or subsequent generation and not, as plaintiff is attempting to do here, a transfer back from the younger generation to an original shareholder. The history of transfers from the Rosan shareholders supports this interpretation; since the Rosan Shareholder Agreement was executed in 1996, there have been nine transfers from an original shareholder to another family member and each one went to someone in the current or the "next" generation, e.g., from plaintiff's father, David, to plaintiff in 2012.[70] Plaintiff's purported sale would be the first time that shares

---

[69] RSA at 2, ECF 118-4.
[70] *See* Stanford Decl., Ex. 21 at 1–2, ECF 118-22; *see also* Def. Mot. Summ. J. 17, ECF 117.

were transferred backwards, so to speak, to an original shareholder. It would also be the first time that Rosan shares were transferred for any consideration at all.[71] Plaintiff's purported sale for $10 million is a notable outlier on both counts. Finally, plaintiff and defendant's familial connection is, at least in a legal sense, remote. When defendant was married to plaintiff's paternal grandfather Andy, defendant was plaintiff's step-grandmother, and after Andy passed away in 2008, defendant married Albers.[72] Thus, defendant is now plaintiff's former step-grandmother, and that is not one of the familial relationships listed in the exception to the transfer restriction.

In short, plaintiff cannot succeed on a breach of contract claim under the Stock Purchase Agreement because she did not satisfy provisions in the Rosan Shareholder Agreement that restrict the transfer of her shares. Because this issue is dispositive of plaintiff's breach of contract claim, the court does not reach the other issues raised about the enforceability of the Stock Purchase Agreement. *See e.g.*, Def. Mot. Summ. J. 13–14, 23–28, ECF 117; Pl. Mot. Summ. J. 17–21, ECF 157.

### B.    Promissory Estoppel

Both parties move for summary judgment on plaintiff's promissory estoppel claim, through which plaintiff asserts that she "justifiably, reasonably, and detrimentally relied upon" defendant's and Albers' representations by agreeing to sell her Rosan shares to defendant for $10 million. Pl. Mot. Summ J. First Claim for Relief 21, ECF 157; Def. Mot. Summ. J. 28–30, ECF 117. Under Oregon law, "[p]romissory estoppel is not an independent cause of action. It is a substitute for consideration, and provides a basis for enforcing a promise as a contract despite a

---

[71] *See id.*
[72]  *See* First Am. Compl. ¶ 6–11, ECF 28.

lack of consideration, when the promisee has relied on a promise to his or her detriment." *Natkin & Co. v. H.D. Fowler Co.*, 128 Or. App. 311, 314 (1994) (citing *City of Ashland v. Hoffarth,* 84 Or. App. 265, 270 (1987)); *see also Neiss v. Ehlers*, 135 Or. App. 218, 227–28 (1995) (explaining that "[p]romissory estoppel is not a cause of action in itself, but is a subset of and a theory of recovery in breach of contract actions") (simplified). "A promise is enforceable by reason of promissory estoppel if there is: (1) a promise; (2) which the promisor could reasonably foresee would induce conduct of the kind that occurred; (3) actual reliance on the promise; and (4) a substantial change in position by the party seeking to enforce the promise." *Natkin*, 128 Or. App. at 314 (citations omitted).

The promise at issue here is straightforward: plaintiff asserts that defendant promised to buy plaintiff's Rosan shares for $10 million. Pl. Mot. Summ. J. First Claim 22, ECF 157. As mentioned above, between November and December of 2019, plaintiff and Octavian were discussing with defendant and Albers possible arrangements to resolve the conflict of interest that had apparently arisen with the joint representation by Perkins, and a key part of those discussions was a proposal that defendant buy plaintiff's Rosan shares. *See id.* at 8–12. During a phone call on November 13, 2019, Albers suggested "a temporary thing" by which they would "give the impression that [defendant] will buy [plaintiff] out of Rosan" by coming to an agreement that defendant would buy out plaintiff's shares "when we finally determine what the fair value of Rosan is[.]"[73] That, in Albers' mind, would resolve the conflict with "no consequence to either one of us," because it was really a "façade that [defendant] is going to [buy plaintiff's] shares."[74] There was apparently an ongoing valuation of the family's various business

---

[73] Nov. 13, 2019 Phone Call 1 at 3:13–22, ECF 96-1.
[74] *Id.* at 11:4–13.

interests; the "valuation guy" did not "have enough information of anything on Rosan" and not "enough information to finish up" another of the companies, but Albers said the valuation "was 135 to 165 million or 265," although he did not specify whether this value was for Rosan, the other company, or the family's overall business interests.[75]

In a subsequent phone call that day between Albers, plaintiff, and Octavian (defendant was apparently out on an errand), Octavian rejected any "backdoor agreement," and instead wanted a "real agreement that [plaintiff] would be bought out."[76] Based on a conversation he had with a lawyer at another firm, Octavian wanted a specific price, and proposed that the parties "jointly agree . . . to have [the Rosan] property appraised" and then "agree on some valuation" for the purchase price of plaintiff's shares.[77] The sticking point between Octavian and Albers then became whether the conflict could be resolved by a "letter of intent" that defendant would purchase plaintiff's shares if the parties could agree on a fair price (Albers' proposal) or whether the agreement had to provide for the "actual buyout" of plaintiff's shares for a specific price (Octavian's proposal).[78] Albers insisted that a letter of intent was preferred because it was "binding" in that it required them to get a valuation and negotiate, but it maintained some flexibility:

> We . . . go get a fair valuation of Rosan . . . . [A]nd then let's say
> . . . the price is established. [Plaintiff]] likes it and [defendant] says
> okay. What we said this morning is, okay, if you don't want to do
> it, you're sure not going to enforced by [defendant] to do it. And
> we even said walk if you don't want to do it, or do it.[79]

---

[75] *Id.* at 11:23, 12:2–12.
[76] Nov. 13, 2019 Phone Call 2 at 2:8–3:12, ECF 96-2.
[77] *Id.* at 7:12–8:13; *see also id.* 2:20–22.
[78] *Id.* at 9:24–10:24.
[79] *Id.* at 19:11–19.

Octavian's "only hang-up" was that that "obviously. . . there has to be some sort of an agreement on a number, because . . . there can't be an agreement that says, you know, this – this buyout event is going to happen regardless of whether or not we agree on . . . a price."[80] Albers was "against putting firm numbers in[.]"[81] He countered that "it doesn't have to be numbers. It can say the numbers have to be mutually agreeable by [defendant] and [plaintiff]. . . . I've done many deals that have no concrete numbers in them whatsoever. That does not have to exist. Because when you put concrete numbers in, you take the flexibility away from settling."[82]

Octavian did not see the flexibility as particularly helpful, stating "what it does is it creates a situation where [plaintiff] could be essentially forced to stay in Rosan, and that's the opposite of what she wants."[83] He believed the Rosan valuation was straightforward and expressed that plaintiff "wanted to be bought out of Rosan based on a valuation of . . . 185 million," which would put plaintiff's "Rosan number at . . . 10.8 something million."[84] Albers, in plaintiff's words, "dodged" that proposal by stating "no attorney's going to write that up on this deal . . . . We don't have any idea what kind of settlement – we don't even know if there's a settlement possible here."[85] Octavian believed that the 2019 State Shareholder Case should settle on a valuation of Rosan at $185 million, and questioned why the attorneys at Perkins were "not facilitating . . . conversations on a daily basis" using that numbers to "get it done."[86] Albers

---

[80] *Id.* 23:20–25.
[81] *Id.* 36:21–22
[82] *Id.* 34:10–17.
[83] *Id.* 35:4–7.
[84] *Id.* at 38:19–22; 42:1–9.
[85] *Id.* 42:11–15; *see also* Pl. Mot. Summ. J. First Claim 11, ECF 157.
[86] Nov. 19 Phone Call 2 at 42:23–43:2, ECF 96-2.

apparently did not share Octavian's belief that $185 million was a realistic valuation of Rosan, observing that one of Rosan's other shareholders denied it was worth that much.[87]

Eventually, Albers told Octavian to have his other lawyer "draw up an agreement that would make the conflict go away" and told him to "[p]ut in whatever language you want and . . . present it to [Perkins] and see what happens."[88] "Have him draw up a letter," Albers said, "that says, under these circumstances, [plaintiff] agrees to sell to [defendant]. Whatever way you want to write it up, but that's a starting point."[89]

The record contains no letter from Octavian or the other lawyer with whom he was consulting. There is, however, a letter from a Perkins lawyer dated November 19, 2019, which memorializes the lawyer's understanding of the agreement that plaintiff, Octavian, defendant, and Albers eventually made, based on discussions with Octavian on plaintiff's behalf, defendant, Albers, and mediator Eric English: in summary, plaintiff had agreed "not to sell [her] ownership interest in Rosan to anyone other than" defendant or Albers.[90] The letter invited plaintiff to inform Perkins if that "understanding [was] incorrect," but there does not appear to be any follow-up communication from plaintiff or Octavian asserting that the crucial terms in their eyes—i.e., a firm sale price of $10 million dollars, or even a commitment to purchase plaintiff's shares at any price—was missing.

The only time that plaintiff claims defendant and Albers expressly promised to pay $10 million was during an "in person" conversation between Octavian, defendant, and Albers at

---

[87] *See id.* 43:5–20.

[88] *Id.* 46:3–7.

[89] *Id.* 46:10–13; *see also id.* 48:7–9 ("Then have him draw up a letter that makes this thing go away or corrects your problems and let's see what happens.").

[90] Stanford Decl., Ex. 14 at 1, ECF 118-15.

some unspecific date and time at defendant and Albers' house.[91] There is no recording or transcript of this conversation in the record. According to Octavian, this meeting occurred after the November 19, 2019 letter from Perkins, which Octavian characterized as a "starting point" for more specific settlement discussions between plaintiff and defendant, and plaintiff asserts that it was after this in-person conversation that she and defendant reduced their agreement to writing in the Stock Purchase Agreement.[92]

But having arrived again at the epicenter of this case—the disputed Stock Purchase Agreement—a fundamental problem with plaintiff's promissory estoppel claim arises. Where there is an express contract term governing the dispute, the remedy of promissory estoppel is generally not available. *See Kraft v. Arden*, No. 3:07-cv-00487-PK, 2008 WL 4866182, at *10 (D. Or. Nov. 7, 2008) ("Promissory estoppel does not apply when a valid contract exists.") (citing *Hill v. Mayers,* 104 Or. App. 629, 631 (1990)); *see also Natkin*, 128 Or. App. at 316 ("We need not consider whether plaintiff has stated a claim for breach of contract based on a theory of promissory estoppel, because we conclude that plaintiff has sufficiently alleged breach of an express contract."); *Cutler v. U.S. Bank Nat'l Ass'n*, No. 3:18-cv-01045-YY, 2019 WL 157919, at *5 (D. Or. Jan. 9, 2019) ("[P]romissory estoppel does not apply when a valid contract exists. Thus, to the extent Plaintiff relies on a theory of promissory estoppel, it appears inconsistent with his allegations of the existence of an express contract.") (internal citation and quotation marks omitted). Moreover, there was consideration at the time the parties allegedly entered into the Stock Purchase Agreement whereby plaintiff agreed to exchange her shares in Rosan, which were valuable at the time, for $10 million. There is no promissory estoppel claim where there is

---

[91] Heekin Decl. (O. Jurj Dep. 23:18–24:4), ECF 129-1.
[92] *See* O. Jurj. Dep. 121:14–122:20, ECF 129-1; SPA at 1, ECF 118-3.

consideration. *See Hill*, 104 Or. App. at 631 (explaining that "promissory estoppel presupposes that there is no actual consideration"); *Claus v. Columbia State Bank*, No. 3:16-cv-01509-AC, 2019 WL 5624754, at *22 (D. Or. Oct. 30, 2019) (finding that promissory estoppel claim was barred where alleged oral promise was supported by consideration).

Thus, the existence of the Stock Purchase Agreement—and the parties competing versions of how or whether it came to be—necessarily renders any promissory estoppel claim based on the promise to buy plaintiff's shares for $10 million legally insufficient. On the one hand, if plaintiff's version is credited as true, then the existence of the Stock Purchase Agreement forecloses any promissory estoppel claim based on the terms of the agreement itself, notwithstanding the fact that, as explained above, plaintiff cannot actually succeed on a breach of contract claim against defendant. *See Smith v. Hawkins*, 84 Or. App. 336, 339 (1987) (treating a counterclaim pleaded as "promissory estoppel" as one for breach of contract "[b]ecause promissory estoppel is a shorthand method of contending that action in reliance on a promise results in the formation of a valid enforceable contract"); *Slate v. Saxon, Marquoit, Bertoni & Todd*, 166 Or. App. 1, 8 (2000), *abrogated on other grounds by Cocchiara v. Lithia Motors, Inc.*, 353 Or. 282 (2013) (rejecting argument that if plaintiff was "unable to pursue either a breach of contract or a promissory estoppel claim, he is caught in a 'Catch 22' and cannot recover under either theory" because Oregon case law on promissory estoppel does not require there "be *some* judicial remedy for *every* inopportune vicissitude of life that does not constitute a breach of contract, nor does it seem to us to be a 'Catch 22' situation that some events—distasteful though they may be—simply cannot result in a successful lawsuit") (emphasis in original); *W.G. Barr Mgmt., LLC v. ContekPro LLC*, No. 23-cv-02257-TSH, 2024 WL 2868146, at *7 (N.D. Cal. June 5, 2024) (applying Oregon law and granting summary judgment against promissory estoppel

claim where the parties entered into an express contract, despite the fact that breach of contract claim was "time-barred by the contractual limitation period: "Any oral agreement to [perform under the contract] is not separate and apart from the written contract.").

If defendant's version is credited as true, and the Stock Purchase Agreement was procured through fraud or by some other means through which defendant did not knowingly assent to the deal, then certainly the equities would not favor enforcing any promise by defendant or Albers to plaintiff's advantage. *See Natkin*, 128 Or. App. at 314 (noting that promissory estoppel "is applied if injustice can be avoided only by enforcement of the promise") (citation and quotation marks omitted); *Neiss*, 135 Or. App. at 226 (explaining that the evolution of promissory estoppel is "an attempt by the courts to keep remedies abreast of increased moral consciousness of honesty and fair representations in all dealings" and it applies where "justice generally requires the enforcement of the promise through the medium of an appropriate contractual remedy") (in part quoting *Vigoda v. Denver Urban Renewal Auth.*, 646 P.2d 900, 905 (Colo. 1982)).

Therefore, defendant's motion for summary judgment on plaintiff's promissory estoppel claim is granted. Given that plaintiff's claims for promissory estoppel and breach of contract are subject to summary judgment,[93] it is not necessary to reach the issues raised by plaintiff's motion for summary judgment against defendant's affirmative defenses. *See* ECF 102.

### C.    Defendant's Counterclaims

Plaintiff has also moved for judgment on the pleadings (ECF 88) and for summary judgment (ECF 95) on defendant's counterclaims for *quantum meruit* and elder financial abuse.

---

[93] Plaintiff withdrew her claim for specific performance. *See* Pl. Opp'n Def. Mot. Summ. J. 24–25, ECF 127.

*See also* Amended Answer, Affirmative Defenses and Counterclaims ¶¶ 80–94, ECF 81. Each claim is addressed in turn.

### 1.    Quantum Meruit

The primary thrust of defendant's *quantum meruit* counterclaim is that she seeks to recover from plaintiff half ($435,000) of the total ($870,00) in legal fees that defendant solely paid to Perkins for legal services rendered to plaintiff and defendant while the two were jointly represented by the firm in the 2019 State Shareholder Case. *See* Def. Opp'n Mot. J. Pleadings 8, ECF 91. In their briefing, the parties dispute the proper elements of a *quantum meruit* claim, whether defendant's *quantum meruit* claim is a quasi-contractual claim asserting a contract "implied in fact" or "implied in law," and whether *quantum meruit* and unjust enrichment are separate legal theories subject to different standards under Oregon law. *See, e.g.*, Def. Opp'n Mot. J. Pleadings 8–9, ECF 91; Pl. Reply Mot. J. Pleadings 4–5, ECF 94; Pl. Mot. Summ. J. Counterclaims 28–33, ECF 95. Although plaintiff's counterclaim is labeled as *quantum meruit*, it is better classified as an equitable claim for restitution or unjust enrichment. Broadly speaking, "unjust enrichment fundamentally refers to returning to the plaintiff 'something which in equity and good conscience did not belong to the defendant.' " *BenefitElect, Inc. v. Strategic Benefit Sols. Corp.*, 614 F. Supp. 3d 838, 846 (D. Or. 2022) (quoting *Derenco, Inc. v. Benj. Franklin Fed. Sav. & Loan Ass'n*, 281 Or. 533, 558 (1978)). *Quantum meruit* refers to a type of unjust enrichment or restitution claim "where the plaintiff has performed services for defendant and seeks to recover their fair value." *Kashmir Corp. v. Patterson*, 43 Or. App. 45, 47 (1979). Here, defendant did not perform any service on plaintiff's behalf; instead, defendant asserts that she paid plaintiff's share of what was a joint obligation to a third party and that plaintiff should be required to pay defendant for that share.

This technical pleading issue and confusion over the proper "elements" of the claim at issue here can be excused, not only because the underlying theory of the claim is made clear by defendant's factual allegations and the parties' subsequent briefing, but also because the law of restitution and unjust enrichment is a "work in progress" and is therefore "notoriously difficult to conceptualize and to summarize." *Larisa's Home Care, LLC v. Nichols-Shields*, 362 Or. 115, 124–25 (2017); *see also id.* at 126 (explaining that "[a]nother difficulty with [restitution and unjust enrichment] is the terminology itself, which can give rise to disordered thinking about the concepts"). Restitution and unjust enrichment are flexible doctrines for which strict adherence to labels or "formulaic checklists" of elements is particularly inapt. The Oregon Supreme Court in *Larisa's Home Care* specifically rejected the use of a three-element test for analyzing unjust enrichment claims under Oregon law and instead directed courts to "examine the established legal categories of unjust enrichment as reflected in Oregon case law and other authorities to determine whether any particular enrichment is unjust." 362 Or. at 132. Decisions following *Larisa's Home Care* regularly refer to and analyze claims of unjust enrichment and *quantum meruit* using the same "case-by-case" analysis from *Larisa's Home Care*, and this opinion and order follows suit. *See, e.g.*, *The Hoag Living Tr. dated Feb. 4, 2013 v. Hoag*, 292 Or. App. 34, 47 (2018) (finding that the defendant had adequately pleaded claims for unjust enrichment and *quantum meruit* based on survey of "established legal categories of unjust enrichment as reflected in Oregon case law and other authorities" as *Larisa's Home Care* directed); *BenefitElect*, 614 F. Supp. 3d at 845 (applying *Larisa's Home Care* to quatum meruit claim); *see also* Def. Opp'n. Mot. Summ. J. Counterclaims 7–8 n.2, ECF 99 (noting that Oregon courts analyze claims for unjust enrichment and quantum meruit "on the facts of each case . . . not the name under which a particular claim is plead"). Thus, to the extent that plaintiff's motion for

judgment on the pleadings is still relevant, given that plaintiff has also moved for summary judgment on this counterclaim, that motion is denied as to defendant's *quantum meruit* counterclaim.

Defendant bases her claim for *quantum meruit* or unjust enrichment on the joint engagement letter from Perkins stating that the "legal bills will be sent to [plaintiff], but each of you will be jointly and severally responsible for payment."[94] According to defendant, she paid Perkins approximately $870,000 in legal bills, while plaintiff did not pay anything. And defendant asserts that her claim against plaintiff for half of the amount paid to Perkins "falls squarely within accepted concepts of restitution" described in section 23 of the Restatement (Third) of Restitution. Def. Opp'n Mot. J. Pleadings 9, ECF 91; *see also* Def. Opp'n Mot. Summ. J. Counterclaims 8, ECF 99. Section 23 provides:

> If the claimant renders to a third person a performance for which claimant and defendant are jointly and severally liable, the claimant is entitled to restitution from the defendant as necessary to prevent unjust enrichment.
>
> (2) There is unjust enrichment in such a case to the extent that
>
>> (a) the effect of the claimant's intervention is to reduce an enforceable obligation of the defendant to the third person, and
>>
>> (b) as between the claimant and the defendant, the obligation discharged (or the part thereof for which the claimant seeks restitution) was primarily the responsibility of the defendant.

Restatement (Third) of Restitution and Unjust Enrichment § 23 (2011).

Plaintiff asserts that section 23 requires there be some "preexisting allocation of the percentage that [plaintiff and defendant] each would pay of the amounts that [Perkins] would

---

[94] Sortun Decl., Ex. 1 at 3, ECF 100-1.

charge," Pl. Reply Mot. J. Pleadings 6, ECF 94, or "at a minimum," a request by defendant that

plaintiff pay her share and plaintiff's refusal to do so. Pl. Reply Mot. J. Pleadings 10–11, ECF

109. Plaintiff's argument, though, reads too narrowly what an "obligation" may include. It is

undisputed that the joint representation letter from Perkins stated that plaintiff and defendant

were jointly and severally liable for the fees, and that plaintiff did not pay part of the

approximately $870,000 total. That, as defendant asserts, "fits squarely" into the category of

unjust enrichment provided in section 23 of the Restatement and its explanatory comments. *See*

Restatement (Third) of Restitution and Unjust Enrichment § 23 (2011) cmt. a ("A claim in

restitution is potentially available in any situation not governed by express contract in which A

discharges all or part of what is (i) a common liability of A and B vis-à-vis a third-party obligee,

but (ii) the obligation of B as between A and B. The consequence is that A has to that extent

performed B's obligation; unless A intended to make a gift to B, such a transaction gives A a

prima facie claim in restitution to the extent of B's unjust enrichment.").

Finally, plaintiff and Octavian testified that there was an "understanding" with defendant

and Albers that defendant and Albers would pay the legal bills while plaintiff and Octavian

would do "all the leg work."[95] Pl. Mot. Summ. J. Counterclaims 30–31, ECF 95. Albers, though,

denies that there was any such mutual understanding.[96] Thus, there is a disputed issue of fact as

---

[95] B. Jurj Dep. 41:16–23, ECF 98-2.

[96] Albers Decl. ¶ 4, ECF 101. Plaintiff's motion to strike this portion of Albers declaration as
hearsay, speculation, or a "sham affidavit" in that it contradicts Albers' deposition testimony is
denied. *See* Reply Pl. Mot. Summ. J. Counterclaims 3–6, ECF 109. As explained above, Albers
was closely involved on defendant's behalf in the 2019 State Shareholder Case and, as made
apparent by plaintiff's own briefing, played a central role in discussions with plaintiff, Octavian,
and defendant about resolving the conflict of interest arising out of representation by Perkins. He
therefore can speak from personal knowledge about those conversations and surrounding
circumstances. Moreover, there is no clear and unambiguous contradiction between Albers'
declaration and deposition testimony that would warrant resort to the sham affidavit rule. *Van*

to the existence of any such agreement and plaintiff's motion for judgement on the pleadings and for summary judgment on defendant's *quantum meruit* claim must be denied.

### 2.    Elder Financial Abuse

Although much of the analysis above regarding defendant's motion for summary judgment assumed that defendant had in fact signed the Stock Purchase Agreement, the analysis regarding defendant's counterclaim for elder abuse does not rest on that same assumption. Instead, this counterclaim is essentially based on the theory that plaintiff wrongfully misappropriated defendant's signature and affixed it to the Stock Purchase Agreement without defendant's knowledge. *See* Def. Opp'n Mot. Summ. J. Counterclaims 10–12, ECF 99.

"[T]he elements of a statutory claim for financial elder abuse are (1) a taking or appropriation, (2) of money or property, (3) that belongs to an elderly person, and (4) the taking must be wrongful." *Schmidt v. Noonkester*, 287 Or. App. 48, 53 (2017); *see also* O.R.S. 124.110(1). The dispositive element here is "taking." Several decisions from this court have, for purposes of applying O.R.S. 124.110, defined a taking as "involv[ing] the complete acquisition of, and not mere interference with or improper use of, a vulnerable person's money or property." *Russi v. Wissenback*, No. 6:18-cv-01028-AA, 2019 WL 1965830, at *3 (D. Or. Apr. 28, 2019) (quoting *Goldingay v. Progressive Cas. Ins. Co.*, 306 F. Supp. 3d 1259, 1269 (D. Or. 2018)). For "interference" to sustain an elder abuse claim, these cases suggest a high bar whereby the interference must be "so persistent or severe as to rise to the level of conversion or wrongful

---

*Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (providing requirements for striking declaration under the sham affidavit rule and explaining that the rule "should be applied with caution" because it "is in tension with the principle that a court's role in deciding a summary judgment motion is not to make credibility determinations or weigh conflicting evidence").

acquisition." *Id.* One of the alleged takings in *Russi* was that the defendant appropriated the plaintiff's identity "to engage in online transactions" and appropriated plaintiff's email account and financial records "by using and accessing them, respectively." *Id.* at *3. This was not enough to allege an elder financial abuse claim because the complaint did not include "sufficient factual content to establish interference with that property that is so persistent or severe that it is equivalent to a conversion or wrongful acquisition." *Id.* at *4.

Moreover, in *Schmidt*, the Oregon Court of Appeals rejected an elder financial abuse claim in a case somewhat similar to this one. There, the plaintiffs and the defendant were neighbors who had a dispute over some contracting work that the defendant's son did for the plaintiffs. 287 Or. App. at 50. They entered a settlement agreement whereby the defendant, who was in her mid-seventies, agreed to, among other things, release her interest in an easement she had over the plaintiff's property. *Id.* at 50–51. Later though, the defendant refused to release the easement, claiming that she never actually intended to go through with that part of the deal. *Id.* at 51. The plaintiffs sued for breach of contract, declaratory relief, and fraud; defendant counterclaimed for elder financial abuse, alleging that the plaintiffs "wrongfully coerced defendant into signing the settlement agreement . . . and thereafter began to seek to enforce it against the defendant and threatened to cut off defendant's only reasonable access to her property." *Id.* at 51. The elder abuse theory depended on establishing that the fraud claim was essentially "unfounded litigation," and plaintiff sought to recover damages for emotional distress and the attorney fees she spent in defending against it. *Id.* at 54. The court assumed, without explicitly deciding, that "unfounded litigation" could meet the "wrongful" element of an elder abuse claim but still held that defendant's elder abuse claim failed because she failed to present any evidence of a "taking" of her money or property: "[T]he alleged damages incurred by

defendant—the time, effort, stress, and expense incurred in defendant against plaintiffs' fraud claim—do not involve a transfer of defendant's money or property into plaintiff's 'own keeping.' " *Id.*

Here, there is no evidence of a "taking" as that term is understood under Oregon's elder abuse statute. For one, plaintiff has not "completely acquired" any money from defendant because defendant has refused to pay plaintiff's $10 million demand under the Stock Purchase Agreement. Nor has defendant established that the alleged wrongful use of defendant's signature is a taking of property under the elder abuse statute. This case is more similar to *Schmidt*, where a vulnerable person was allegedly coerced into signing an agreement and then claimed to be damaged by "unfounded litigation," and *Russi*, where the defendant "appropriated" a vulnerable person's email account and other electronic information, than the cases defendant cites involving the "unauthorized use of a person's name or image to sell goods or services" or a doctor who assisted a person in accessing the confidential records related to adoption. *See* Def. Opp'n Mot. Summ. J. Counterclaims 10–11, ECF 99 (citing *Humphers v. First Interstate Bank of Oregon*, 298 Or. 706, 714–15 (1985); *Anderson v. Fisher Broad. Companies, Inc.*, 300 Or. 452, 467–68 (1986)).[97]

---

[97] It appears that defendant may have meant to cite to an earlier case that was discussed by the court in *Humphers* wherein the Oregon Supreme Court found that the plaintiff had stated a claim for the invasion of the "right to privacy" when defendant used the plaintiff's name without plaintiff's knowledge to sign and deliver to the governor of Oregon a telegram that purported to state plaintiff's position on a political issue. *Hinish v. Meier & Frank Co.*, 166 Or. 482, 485 (1941); *see also Humphers*, 298 Or. at 714-15 (citing *Hinish*). The claim in *Hinish* did not rest on the appropriation of the plaintiff's signature, but rather on the defendant's use of plaintiff's signature to insert the plaintiff into a public political debate without plaintiff's permission, which the court took great lengths to analogize to a then-emerging "right to privacy" that was based, in part, on cases involving the use of the "name or photograph of a person without his authority . . . for advertising or commercial purposes[.]" 166 Or. at 485-86; *see also id.* at 486–506. There is no allegation, much less any proof, that plaintiff has used defendant's signature in such a way to publicize defendant without permission.

For all these reasons, plaintiff's motion for summary judgment on defendant's counterclaim for elder financial abuse is granted.

### ORDER

Defendant's Motion for Summary Judgment [117] is granted, which renders plaintiff's Motion for Partial Summary Judgment Against Defendant's Affirmative Defenses [102] and plaintiff's Motion for Summary Judgment on Plaintiff's First Claim for Relief [157] moot. Plaintiff's Motion for Summary Judgment Against Defendant's Counterclaims [95] is granted in part and denied in part. Plaintiff's Motion for Judgment on the Pleadings Against the Counterclaims [88] is denied as to defendant's *quantum meruit* counterclaim and otherwise denied as moot.

IT IS SO ORDERED.

DATED September 13, 2024.

_____/s/ Youlee Yim You_____
Youlee Yim You
United States Magistrate Judge